UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CURED NUTRITION LLC,

Plaintiff,

v. Case No. 8:25-cv-975-TPB-CPT

SAAMIR MITHWANI
and AVANTLIGHTS LLC,

Defendants.
_____________________________/

**REPORT AND RECOMMENDATION**

Before me on referral is Plaintiff Cured Nutrition, LLC's (Cured Nutrition) amended motion for a default judgment pursuant to Federal Rule of Civil Procedure 55 against defaulted Defendants Saamir Mithwani and AvantLights LLC (AvantLights). (Doc. 29). For the reasons set forth below, I respectfully recommend that Cured Nutrition's amended motion be granted in part and denied in part.

I.

The following facts are largely derived from Cured Nutrition's complaint and the attachments thereto (Doc. 1) and are assumed to be true for purposes of Cured Nutrition's instant motion. *See Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (per curiam) ("[A] defaulted defendant is deemed to admit the

plaintiff's well-pleaded allegations of fact[.]") (internal quotation marks and citation omitted); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (observing that an exhibit attached to a complaint is a part of that pleading) (quoting Fed. R. Civ. P. 10(c)). Cured Nutrition is a limited liability company formed under the laws of Colorado with a principal place of business in Castle Rock, Colorado. (Doc. 1 at 2). Established in 2017, Cured Nutrition operates an online store at "curednutrition.com," through which it sells various nutrition and wellness products, including herbal dietary supplements such as gummies and capsules. *Id*. at 3. These products are of high quality and are marketed to weight management seekers, fitness enthusiasts and athletes, and health-conscious individuals with specific health conditions. *Id*. at 5. Cured Nutrition's online store and the company's offerings bear its common law trademark, which consists of the word "CURED" in bold, capital letters, along with a "triangle logo" (hereinafter, CURED mark). *Id*. at 3–4, 18.

Since its inception, Cured Nutrition has used its CURED mark in commerce throughout the United States in connection with the distribution and sale of its dietary and nutritional supplements, drink mixes, powders, and food. *Id*. at 4. During this period, Cured Nutrition has spent more than $5.3 million on promoting and advertising these products through social media platforms like Instagram, Facebook, and TikTok. *Id*. As a result of these efforts, Cured Nutrition's offerings designated with the CURED mark have acquired "incalculable distinction, reputation, and

goodwill." *Id*. at 5. To date, Cured Nutrition has sold more than $18 million worth of its supplements and gummies under the CURED mark. *Id*.

Mithwani is a resident of Florida and the owner, operator, and decision-maker for AvantLights. *Id*. at 3. AvantLights is a limited liability company formed under the laws of Florida with a principal place of business in Lutz, Florida. *Id*. Akin to Cured Nutrition, Mithwani and AvantLights are engaged in marketing and selling herbal and dietary supplements in gummy form through their online store at "trycured.com." *Id*. at 5. Mithwani and AvantLights registered the "trycured.com" domain and are the current owner and holder of that domain. *Id*. at 7.

According to Cured Nutrition, Mithwani and AvantLights adopted and began using a mark that closely resembled the CURED mark without Cured Nutrition's permission after Cured Nutrition acquired protectable rights in that mark. *Id*. at 5, 22. Like Cured Nutrition's mark, Mithwani's and AvantLights's mark is comprised of the word "Cured," although it is not written in bold, capital letters and also lacks the accompanying triangle logo.[1] *Id*. at 5, 22, 34. Cured Nutrition maintains that Mithwani and AvantLights commenced utilizing their "confusingly similar" mark willfully and intentionally in an effort to trade off of Cured Nutrition's goodwill and reputation. *Id*. at 5–7. Cured Nutrition further maintains that Mithwani and AvantLights distributed, promoted, advertised, and sold their herbal and dietary

[1] Cured Nutrition additionally alleges that Mithwani and AvantLights deliberately misrepresent that their mark is registered with U.S. Patent and Trademark Office by placing the "circle-R" symbol next to the infringing mark. *Id*. at 6.

supplements under their infringing mark through the same channels as Cured Nutrition (i.e., online retail services and social media platforms such as Instagram, Facebook, and TikTok) and to the same types of customers as Cured Nutrition (i.e., weight management seekers, fitness enthusiasts and athletes, and health-conscious individuals with specific health conditions). *Id*. at 6. Cured Nutrition maintains as well that Mithwani and AvantLights's unauthorized use of the CURED mark on the Defendants' website—trycured.com—has caused confusion, mistake, and deception among actual and potential customers regarding the source, origin, and sponsorship of Cured Nutrition's products. *Id*. at 7, 35–62. Lastly, Cured Nutrition maintains that Mithwani's and AvantLights's infringing activities have harmed and are likely to continue harming the reputation and goodwill associated with Cured Nutrition and its CURED mark. *Id*. at 7.

In December 2024, Cured Nutrition sent a cease-and-desist letter to Mithwani and AvantLights objecting to their use of the CURED mark. *Id*. at 8, 24. Among other things, Cured Nutrition stated in its letter that it believed Mithwani and AvantLights were intentionally infringing upon the CURED mark for commercial benefit and instructed them to stop doing so. *Id*. at 8, 24–27. Mithwani and AvantLights neither responded to Cured Nutrition's letter nor terminated their unlawful behavior. *Id*. at 8.

Based on Mithwani's and AvantLights's illicit actions, Cured Nutrition initiated this lawsuit in April 2025 by filing a three-count complaint against the Defendants,

asserting claims under the Lanham Act, 15 U.S.C. § 1125(a), the Anti-Cybersquatting Consumer Protection Act (ACPA), 15 U.S.C. §1125(d), and Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201–213. Mithwani and AvantLights did not answer Cured Nutrition's complaint, which led Cured Nutrition to seek and obtain clerk's defaults against them. (Docs. 18, 19).

Cured Nutrition then timely moved for a default judgement against Mithwani and AvantLights under Rule 55. (Doc. 20). The Court denied that motion without prejudice because the motion was deficient in a number of respects. (Doc. 26).

The instant amended motion followed. By way of that submission, Cured Nutrition renews its request for a default judgment and asks that it be awarded statutory damages, injunctive relief, and attorneys' fees. Mithwani and AvantLights have not responded to Cured Nutrition's amended motion, and the time for doing so has expired.

In early July 2026, I heard oral argument on the matter. During that proceeding, Cured Nutrition conceded several points regarding the relief it seeks. Cured Nutrition's amended motion is thus now ripe for the Court's consideration.

II.

Rule 55 provides that where, as here, a clerk's default has been entered, a plaintiff may apply to either the clerk or the court for a default judgment. Fed. R. Civ. P. 55(b). Before awarding such relief, however, a court must ensure that it has both subject matter jurisdiction over the plaintiff's claims and personal jurisdiction over the

defendants. *Wagner v. Giniya Int'l Corp.*, 2020 WL 7774385, at *1 (M.D. Fla. Dec. 3, 2020), *report and recommendation adopted*, 2020 WL 7768949 (M.D. Fla. Dec. 30, 2020). Part of this inquiry obligates a court to confirm that the defendants have been properly served with the complaint. *Opella v. Rullan*, 2011 WL 2600707, at *4 (S.D. Fla. June 29, 2011) ("Insufficient or improper service of process cannot support the entry of a default judgment, even if the defendant has actual notice of the suit."), *report and recommendation adopted*, 2011 WL 13220496 (S.D. Fla. Aug. 9, 2011).

If subject matter and personal jurisdiction are established, a court must then ascertain whether "there is 'a sufficient basis in the pleadings for the [sought-after] judgment[.]'" *Surtain*, 789 F.3d at 1245 (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)[2]). The burden on the movant in this context is akin to the one borne by a party seeking to defeat a motion to dismiss for failure to state a claim. *See Graveling v. Castle Mortg. Co.*, 631 F. App'x 690, 698 (11th Cir. 2015) (per curiam)[3] ("The requisite factual showing for a default judgment is similar to the factual showing necessary to survive a motion to dismiss for failure to state a claim.") (citing *Surtain*, 789 F.3d at 1245); *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim.") (citations omitted). Accordingly, a court looks to see whether

---

[2] The Eleventh Circuit, in its en banc decision in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), adopted as precedent the opinions of the former Fifth Circuit rendered prior to October 1, 1981.

[3] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

the complaint contains adequate factual averments which, if accepted as true, state "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In undertaking this analysis, a court must consider a defaulted defendant to have "admit[ted] the plaintiff's well-pleaded allegations of fact." *Cotton v. Mass. Mut. Life. Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005).

If a claim is properly pleaded, a court must then address the issue of damages and other available remedies. To determine the amount of damages to be awarded, a court may conduct an evidentiary hearing on the matter. Fed. R. Civ. P. 55(b)(2)(B). Such a hearing is not necessary, however, where the requested damages constitute a liquidated sum, are capable of mathematic calculation, or "where all essential evidence is already of record." *Secs. & Exch. Comm'n v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005) (citation omitted); *see also Perry Ellis Int'l, Inc. v. URI Corp*., 2007 WL 3047143, at *1 (S.D. Fla. Oct. 18, 2007) (observing that a court may grant statutory damages "based upon affidavits and other documentary evidence if the facts are not disputed"); *PetMed Express, Inc. v. MedPets.Com, Inc.,* 336 F. Supp. 2d 1213, 1217 (S.D. Fla. 2004) (same). In the end, resolution of the issue of damages is left to a court's sound discretion. *Axiom Worldwide, Inc. v. Excite Medical Corp*., 591 F. App'x 767, 775 (11th Cir. 2014); *PetMed Express*, 336 F. Supp. 2d at 1219 (citing *Cable/Home Commc'n Corp. v. Network Prod., Inc*., 902 F.2d 829, 852 (11th Cir. 1990) and *Microsoft Corp. v. Tierra Computer, Inc*., 184 F. Supp. 2d 1329, 1331 (N.D. Ga. 2001)).

In addition to damages, a court may—with or without an evidentiary hearing—exercise its equitable discretion to grant an injunction if such a remedy is properly supported. *Nat'l Staffing Sols., Inc. v. Young Holdings & Invs., LLC*, 2020 WL 6587246, at *1 (M.D. Fla. Aug. 13, 2020) (noting that an injunction may "be awarded in a default situation[ ] without an evidentiary hearing"); *Homevestors of Am., Inc. v. Bay Area Hauling, LLC*, 2019 WL 5394189, at *6 (M.D. Fla. Sept. 10, 2019) (finding a permanent injunction warranted upon the entry of default judgment); *Nygard v. Jasper,* 2016 WL 9526666, at *5 (M.D. Fla. Jan. 4, 2016) ("Even in a default judgment case, [an] injunct[ion] . . . is appropriate pursuant to the Lanham [A]ct and common law."). A court may also award attorneys' fees to the prevailing party if authorized under the governing law. *See, e.g., Nelson v. Major*, 2023 WL 6633566, at *2 (M.D. Fla. Oct. 12, 2023) (granting attorney's fees with a default judgment); *SE Prop. Holdings, LLC v. Green*, 2013 WL 790902, at *6 (S.D. Ala. Mar. 1, 2013) (same). Each of the above considerations—jurisdiction, liability, damages, and other remedies—will be addressed in turn.

III.

Under 28 U.S.C. § 1331, federal courts have federal question jurisdiction over all civil actions "arising under" the laws of the United States. *See* 28 U.S.C. § 1331. These laws include the Lanham Act and the ACPA.[4] *See DiMaggio, LLC. v. City, Cnty.*

[4] There are other bases for federal question jurisdiction too. *See* 15 U.S.C. § 1121(a) (providing jurisdiction over federal trademark actions); 28 U.S.C. § 1338(a) (providing jurisdiction over "any Act of Congress relating to . . . trademarks").

*of San Francisco,* 187 F. Supp. 2d 1359, 1364 (S.D. Fla. 2000) (concluding that the presence of a Lanham Act claim "establishes federal question jurisdiction"); *Z Prods., Inc. v. SNR Prods., Inc.*, 2010 WL 5057375, at *1 (M.D. Fla. Oct. 28, 2010) (stating that an ACPA claim "arises out of original federal question jurisdiction"), *report and recommendation adopted sub nom. Z Prods. v. SNR Prods., Inc.*, 2010 WL 5058385 (M.D. Fla. Dec. 6, 2010). As a result, the Court has federal question jurisdiction over Cured Nutrition's Lanham Act and ACPA claims.

Federal courts also have supplemental jurisdiction over state law claims that share a "common nucleus of operative fact" with federal claims in the same action. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *see also* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]"). Because Cured Nutrition's Lanham Act and ACPA counts appear to be premised on the same conduct as Cured Nutrition's FDUTPA count, the Court has jurisdiction over the latter count as well. *See* (Doc. 1 at 9–12); *see also Wyndham Vacation Ownership, Inc. v. Salkin*, 2023 WL 4350566, at *2 (M.D. Fla. Apr. 25, 2023) (exercising supplemental jurisdiction over the plaintiff's FDUTPA claim because it "ar[ose] out of the same controversy" as the plaintiff's Lanham Act claim), *report and recommendation adopted*, 2023 WL 4350441 (M.D. Fla. May 15, 2023); *Promex, LLC v. Perez Distrib. Fresno, Inc.*, 2010 WL 3452341, at *12–13 (S.D. Fla. Sept. 1, 2010) (exercising supplemental jurisdiction over the

plaintiff's FDUTPA count because it stemmed from a "common nucleus of operative fact" as the plaintiff's federal trademark infringement claims) (citations omitted).

The Court likewise has personal jurisdiction over both Mithwani and AvantLights. The concept of personal jurisdiction is comprised of two distinct components: amenability to jurisdiction and service of process. *Prewitt Enters., Inc. v. Org. of Petrol. Exp. Countries*, 353 F.3d 916, 925 n.15 (11th Cir. 2003) (quoting *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1264 (5th Cir. 1983)). "Amenability to jurisdiction means that a particular defendant is within the substantive reach of the court's jurisdiction under the governing law, while service of process is simply the physical means by which that jurisdiction is asserted." *DeMelo*, 711 F.2d at 1264 (internal quotation marks and citation omitted).

Here, Mithwani is amenable to the Court's jurisdiction because he is a Florida resident. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) ("[An] individual's domicile [is the] the paradigm forum for the exercise of [personal] jurisdiction[.]"). AvantLights is also amenable to the Court's jurisdiction because it is a limited liability company formed under the laws of Florida and because its principal place of business is in Florida. *See Daimler*, 571 U.S. at 118 ("[T]he . . . all-purpose forums for [personal] jurisdiction are a corporation's place of incorporation and [its] principal place of business[.]") (citation omitted); *Jastrjembskaia v. inCruises, LLC*, 2024 WL 5244786, at *5 (11th Cir. Dec. 30, 2024) (extending *Daimler* to limited liability companies) (citing *Daimler*, 571 U.S. at 137). With respect to service of process, affidavits filed on the

public docket demonstrate that Mithwani was properly served in his individual capacity in compliance with Fla. Stat. § 48.031 (Doc. 14) and that AvantLights was correctly served through its registered agent in accordance with Fla. Stat. § 48.062. (Doc. 15).

IV.

With the issues of subject matter and personal jurisdiction resolved, I proceed to the question of whether Cured Nutrition's well-pleaded allegations in its complaint substantiate its Lanham Act, ACPA, and FDUTPA counts. I find that they do.

A.

The Lanham Act "was intended to make actionable the deceptive and misleading use of marks and to protect persons engaged in . . . commerce against unfair competition." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 767–68 (1992) (internal quotation marks and citations omitted). Cured Nutrition's Lanham Act claim is grounded on an "unfair competition" theory and is predicated on section 1125(a) (Doc. 1 at 9–10; Doc. 29 at 10–16), which "supplies a cause of action for common law marks that are used in interstate commerce." *U.S. All Star Fed'n, Inc. v. Open Cheer & Dance Championship Series, LLC*, 179 F.4th 883, 896 (11th Cir. 2026). To establish a prima facie case for an unfair competition claim under section 1125(a), a plaintiff must show that (1) it "had enforceable trademark rights in the mark" at issue, and (2) the defendants engaged in an unauthorized use of the mark "such that

consumers were likely to confuse the two."[5] *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007); *see also Sega Corp. v. P'ships and Unincorporated Ass'n Identified on Schedule "A,"* 2025 WL 2933869, at *3 (S.D. Fla. Aug. 11, 2025) (same) (citation omitted), *report and recommendation adopted*, 2025 WL 2501305 (S.D. Fla. Sep. 2, 2025).

Beginning with the first of these two elements, the term "trademark" includes "any word, name, symbol, or device or any combination thereof . . . used by any person . . . to identify and *distinguish* his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127 (emphasis added). As this language indicates, a trademark must be "distinctive" to be enforceable, meaning it "must be capable of distinguishing the applicant's goods from those of others." *Two Pesos*, 505 U.S. at 768; *see also All Star Fed'n, Inc.*, 179 F.4th at 896 ("A valid trademark is 'distinctive,' meaning it 'identif[ies] the source of the goods or services,' not the goods or services themselves.") (citation omitted). A mark is considered to be distinctive if it either (a) "is inherently distinctive" or (b) "has acquired distinctiveness through secondary meaning." *Two Pesos*, 505 U.S. at 769. Whether a trademark is distinctive is ultimately a question of fact. *See All Star Fed'n, Inc.*, 179 F.4th at 897 ("A mark's distinctiveness category is a question of fact[.]") (citation omitted).

[5] These are the same elements required "to prevail on [a] federal claim of trademark infringement." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012).

To facilitate the distinctiveness analysis, marks are often classified in categories of generally increasing distinctiveness—namely, (1) "generic," (2) "descriptive," (3) "suggestive," and (4) "arbitrary" or "fanciful." *Two Pesos*, 505 U.S. at 768 (citations omitted). Generic marks "refer[ ] to the genus of which the particular product is a species." *Id.* An example of a generic mark is the phrase "'liquor store"' used in connection with the sale of liquor. *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). Descriptive marks, on the other hand, describe an attribute or quality of an article or service. *Two Pesos*, 505 U.S. at 769. An example of a descriptive mark is the term "'vision center'" for "a place where glasses are sold." *Frehling Enters., Inc.*, 192 F.3d at 1335.

By contrast, a suggestive mark denotes "a characteristic of the goods or services and requires an effort of the imagination by the consumer in order to be understood as descriptive." *Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir. 1987); *see also All Star Fed'n, Inc.*, 179 F.4th at 897 ("Suggestive marks bear only an 'oblique relationship to the product' they reference.") (citation omitted).[6] An example of a suggestive mark is the word "'penguin'" used in the context of "refrigerators." *Frehling Enters., Inc.*, 192 F.3d at 1335. And lastly, an arbitrary or fanciful mark "bears no relationship to the product or service" at all. *Cotton*

[6] The Eleventh Circuit explained in *All Star Federation, Inc.* that it has "traditionally employed two tests to determine whether a mark is suggestive." 179 F.4th at 897. The first test "asks whether a mark requires a leap of the imagination to get from the mark to the product," while the second asks whether competitors would "likely . . . need the terms used in the trademark in describing their products." *Id.* (internal quotation marks and citations omitted).

*Ginny, Ltd. v. Cotton Gin, Inc.*, 691 F. Supp. 1347, 1356 (S.D. Fla. 1988) (citing *Am. Television*, 810 F.2d at 1549). A fanciful mark, for instance, is a wholly fictitious word (such as "Verizon" for telecommunications), while an arbitrary word is a real word that has nothing to do with the product or service (such as "Apple" for computers). *All Star Fed'n, Inc.*, 179 F.4th at 897.

Generic marks are never distinctive and thus are not safeguarded by the Lanham Act. *Id.* ("[G]eneric marks . . . can never be[ ] protectible.") (citations omitted); *Tana v. Danatanna's*, 611 F.3d 767, 774 (11th Cir. 2010) ("Generic marks . . . may never be registered as trademarks under the Lanham Act."). The same can be said of descriptive marks that merely describe a product. *Two Pesos*, 505 U.S. at 769 ("Marks which are merely descriptive of a product are not inherently distinctive."). As for suggestive and arbitrary/fanciful marks, because their intrinsic nature serves to identify a specific source of a product, these marks "are deemed [to be] inherently distinctive" and are therefore always deserving of protection. *Id.* at 768.

In this case, Cured Nutrition alleges in its complaint that its CURED mark is "distinctive." *See* (Doc. 1 at 4). To the extent that this averment constitutes a statement of fact as opposed to a legal conclusion, *see Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1523 (11th Cir. 1991) ("[T]he distinctiveness categorization given a term is a question of fact[.]"), this allegation is sufficient to establish that Cured Nutrition's mark is shielded by the Lanham Act. *Surtain*, 789

F.3d at 1245 ("[A] defaulted defendant is deemed to admit the plaintiff's well-pleaded allegations of fact[.]") (internal quotation marks and citation omitted).

Even if Cured Nutrition's averment that its mark is distinctive amounts to a conclusion of law, the mark is still subject to protection. As Cured Nutrition contends in its motion, there is a fair argument that the mark is suggestive, insofar as consumers understand "cured" as promoting and improving health and well-being, both of which can be achieved through nutritional and dietary supplements, among other things.[7] *See* (Doc. 29 at 13); *Am. Television*, 810 F.2d at 1549; *see also Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 513 n. 5 (6th Cir. 2007) ("A suggestive mark . . . requires the observer or listener to use imagination and perception to determine the nature of the goods."); *Zurco, Inc. v. Sloan Valve Co.*, 785 F. Supp. 2d 476, 490 (W.D. Pa. 2011) ("[A] suggestive mark suggests rather than describes the product or source of the goods by conveying indirect or vague information about the product or service.") (internal quotation marks and citation omitted); *Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 450 (S.D.N.Y. 2008) (ruling that a mark is suggestive when it "requires imagination to reach a conclusion as to the nature of the goods").

At a minimum, the CURED mark is descriptive and "has acquired distinctiveness through secondary meaning." *Two Pesos*, 505 U.S. at 769; *see also FN*

---

[7] At oral argument, Cured Nutrition abandoned any contention that its mark is arbitrary or fanciful. *Compare* (Doc. 29 at 13) (maintaining that the CURED mark was "*at least* suggestive") (emphasis added).

*Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1083 (11th Cir. 2016) ("[A] descriptive mark . . . receives protection . . . if it acquires secondary meaning[.]") (internal quotation marks and citations omitted). "Secondary meaning is the connection in the consumer's mind between the mark and the provider of the service." *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1560 (11th Cir. 1991) (citation omitted). A mark gains secondary meaning—and is accordingly considered to be distinctive—"when, in the minds of the relevant consuming public, the primary significance of the term . . . is not the product but the producer." *All Star Fed'n, Inc.*, 179 F.4th at 904 (internal quotation marks and citation omitted). For a mark's secondary meaning to afford it protection, however, the mark must have attained such meaning before the alleged infringement began. *Id.* ("For a mark holder to have a protectable interest in a descriptive mark, the mark must have attained secondary meaning before the date that the alleged infringer used the similar term.") (internal quotation marks and citation omitted); *Trasco Wellness, LLC v. Tampa Bay Spine & Sports Med., LLC, et al.*, 806 F. Supp. 3d 1288, 1309, (M.D. Fla. Oct. 2, 2025) (same) (citing *Investacorp*, 931 F.2d at 1525).

Secondary meaning can be established "through either direct evidence (like consumer surveys) or circumstantial evidence." *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 784 (11th Cir. 2020). Where, as in this case, the mark holder does not offer any consumer surveys, courts in the Eleventh Circuit commonly look to the so-called *Conagra* factors in assessing whether a mark has attained secondary

meaning. *See Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 (11th Cir. 1984). These factors are:

> (1) [T]he length and manner of [the mark's] use; (2) the nature and extent of [the proprietor's] advertising and promotion; (3) the efforts made by the [proprietor] to . . . [foster] a conscious connection in the public's mind between the [mark] and the [proprietor's] product or business; and (4) the extent to which the public actually identifies the [mark] with the [proprietor's] product or venture.

*Royal Palm Props., LLC*, 950 F.3d at 785 (citing *Conagra,* 743 F.2d at 1513). An evaluation of these factors demonstrates that Cured Nutrition mark is distinctive and thus covered by the Lanham Act.

With respect to the first *Conagra* factor, Cured Nutrition avers in its complaint that it has been selling its products with its CURED mark since August 2017. (Doc. 1 at 4). While Cured Nutrition does not delineate a precise date when Mithwani and AvantLights commenced utilizing their infringing mark, it is apparent from the exhibits included with Cured Nutrition's complaint that Cured Nutrition employed its CURED mark for several years prior to the Defendants' conflicting use.[8] *See id*. at 24–46. Moreover, as Cured Nutrition further alleges in its complaint, its use of its mark during this period was "widespread, continuous, and exclusive." (Doc. 1 at 4); *see also FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1084 (11th Cir. 2016) (finding that

---

[8] At oral argument, Cured Nutrition contended that it discovered the Defendants' illicit utilization of its mark close in time to when it sent the Defendants its cease-and-desist letter in December 2024.

roughly two years of usage prior to infringement can be enough to establish secondary meaning). This factor thus favors Cured Nutrition.

Regarding the second and third *Conagra* factors, Cured Nutrition avers that it has spent over $5 million on marketing and promoting its products under the CURED mark since the company's inception. (Doc. 1 at 4). It also alleges that it advertises its products across multiple social media platforms such as Instagram, Facebook, and TikTok and has sold more than $18 million worth of products with the CURED mark. *See id.*; *see also Royal Palm Props., LLC*, 950 F.3d at 786 (noting that the plaintiff presented evidence pertaining to both the second and third *Conagra* factors by "tout[ing] its $1.6 million marketing campaign[,]" which it undertook to "ensure[ ] that it remain[ed]" a significant actor in the marketplace); *Conagra,*, 743 F.2d at 1513 (finding that the sustained usage and distribution of media productions featuring the plaintiff's mark which were aimed at "establish[ing] the [plaintiff's] mark and its relationship to [the plaintiff's] business" fulfilled the third factor); *Vital Pharms., Inc. v. Am. Body Bldg. Prods., LLC*, 511 F. Supp. 2d 1303, 1311 (S.D. Fla. 2007) (deeming the expenditure of $2 million "to advertise the product in various media" to meet the second *Conagra* factor). The second and third factors therefore favor Cured Nutrition as well.

As for the fourth *Conagra* factor, Cured Nutrition again highlights in its complaint its prolific, constant, and singular utilization of its mark and the millions of dollars it has devoted to promoting that mark. *See* (Doc. 1 at 4); *see also Grimes*

*Contracting Grimes Contracting, Inc. v. Grimes Utilities, Inc.*, 2009 WL 88571, at *5 (M.D. Fla. Jan. 13, 2009) ("Distinctiveness of a mark may be increased or acquired 'by virtue of long use and extensive promotion.'") (quoting *E. Remy Martin v. Shaw–Ross Int'l Imp., Inc.*, 756 F.2d 1525, 1533 (11th Cir. 1985)). In addition, it offers uncontested evidence showing that there is confusion surrounding its CURED mark and the Defendants' competing mark not only among ordinary consumers, but also among social media influencers and personalities, some of whom have hundreds of thousands of followers. *See* (Doc. 1 at 4, 24–46); *see also Investacorp,* 931 F.2d at 1526 (observing that "instances of consumer confusion are probative of secondary meaning"). Accordingly, the third factor further favors Cured Nutrition.

Having determined that Cured Nutrition has enforceable rights in its mark and hence satisfies the first prong of its Lanham Act claim, I turn to the second element of that cause of action—namely, whether Mithwani and AvantLights engaged in the unauthorized use of the CURED mark "such that consumers were likely to confuse the two." *Custom Mfg. & Eng'g, Inc.*, 508 F.3d at 647. To resolve this issue, courts in the Eleventh Circuit typically look to the so-called seven *Frehling* factors. *Id*. at 648 ("With respect to the second element [of a section 1125(a) Lanham Act claim], we consider [the] seven [*Frehling*] factors in assessing whether or not the 'likelihood of confusion' exists.") (citing *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335–41 (11th Cir. 1999)). Those seven factors are:

> (1) [T]he type of mark (in short, whether the "relationship between the name and the service or good it describes" is such that the chosen name

> qualifies as generic, descriptive, suggestive, or arbitrary); (2) the similarity of the marks (based on "the overall impressions that the marks create, including the sound, appearance, and manner in which they are used"); (3) the similarity of the goods ("whether the products are the kind that the public attributes to a single source"); (4) the similarity of the parties' retail outlets, trade channels, and customers ("consider[ing] where, how, and to whom the parties' products are sold"); (5) the similarity of advertising media (examining "each party's method of advertising" to determine "whether there is likely to be significant enough overlap" in the respective target audiences such "that a possibility of confusion could result"); (6) the defendant's intent (determining whether the defendant had a "conscious intent to capitalize on [the plaintiff's] business reputation," was "intentionally blind," or otherwise manifested "improper intent"); and (7) actual confusion (that is, whether there is evidence that consumers were actually confused).

*Id*. (quoting *Frehling,* 192 F.3d at 1335–41); *see also All Star Fed'n, Inc.*, 179 F.4th at 907–08.

Although the *Frehling* factors are instructive, the Eleventh Circuit has cautioned that their application "entails more than the mechanistic summation of the number of factors on each side." *Custom Mfg. & Eng'g,* 508 F.3d at 649 (quoting *Frehling*, 192 F.3d at 1342). Instead, the Eleventh Circuit has encouraged courts to focus on "evaluat[ing] . . . the factors['] 'overall balance.'" *Id*. (quoting *Frehling*, 192 F.3d at 1342); *see also Suntree Tech., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012) (noting that likelihood of confusion should not be determined "by merely analyzing whether a majority of the . . . [*Frehling*] factors indicates that such a likelihood exists. . . . Rather, a court must . . . [assess] the weight to be accorded the individual factors and then make its ultimate decision") (internal quotation marks and citation omitted). In

the end, whether there is a likelihood of confusion is a question of fact. *Jellibeans, Inc. v. Skating Clubs,* 716 F.2d 833, 839 (11th Cir. 1983).

In this case, Cured Nutrition alleges that Mithwani's and AvantLights's unsanctioned use of their mark "has caused or is likely to cause confusion, mistake, or deception among customers as [to] the source, origin, or sponsorship" of their herbal and dietary supplements. (Doc. 1 at 7). To the extent this averment constitutes a statement of fact as opposed to a legal conclusion, *see Jellibeans, Inc.,* 716 F.2d at 839, it establishes the second element of Cured Nutrition's Lanham Act claim. *See Surtain*, 789 F.3d at 1245.

Even if this averment is not dispositive of the likelihood of confusion question, an evaluation of the *Frehling* factors settles the matter. Starting with the first factor (i.e., the type of mark—generic, descriptive, suggestive, or arbitrary), as discussed above, the CURED mark is a suggestive or at least descriptive mark that has acquired secondary meaning. As such, it is either a "strong" mark, *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 949 (11th Cir. 2023) (commenting that "suggestive marks are generally strong") or "relatively strong," *Dieter v. B & H Indus. of Southwest Fla., Inc.*, 880 F.2d 322, 329 (11th Cir. 1989) (remarking that a descriptive mark with secondary meaning is "a relatively strong mark"). This factor therefore favors Cured Nutrition.

Regarding the second factor (i.e., the similarity of the competing marks), a "[c]ourt must consider the overall impressions that the marks create, including the

sound, appearance[,] and manner in which they are used." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat. Univ., Inc.,* 91 F. Supp. 3d 1265, 1277 (S.D. Fla. 2015), *aff'd sub nom. Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242 (11th Cir. 2016). In *Frehling*, two marks were considered to be sufficiently alike because one mark included the same word as the other mark (even though it was preceded by a separate four-letter word) and because the marks were written in similar fonts. *Frehling*, 192 F.3d at 1337. Likewise here, Mithwani's and AvantLights's mark and Cured Nutrition's mark both consist of the word "Cured" (with no additional letters) and are also displayed in the same font color. (Doc. 1 at 24, 26). The second factor accordingly weighs in favor of Cured Nutrition as well.

I reach the same conclusion concerning the third factor (i.e., the similarity of the goods promoted by Cured Nutrition and the Defendants). As described previously, Cured Nutrition sells its dietary and nutritional supplements (many in gummy form) to weight management seekers, fitness enthusiasts and athletes, and health-conscious individuals with specific health conditions, while the Defendants market and distribute "herbal and dietary supplements" (also in gummy form) to essentially the same consumers. (Doc. 1 at 5–6, 34). These two comparable products are certainly the same kind of goods that the targeted customer base could "attribute to a single source." *Frehling,* 192 F.3d at 1338.

As for the fourth and fifth factors (i.e., the similarity of the parties' retail outlets, trade channels, and customers, as well as the similarity of their advertising media),

Cured Nutrition and the Defendants—as referenced earlier—rely on the same "online retail services" and "social media[ ] platforms" such as Instagram, Facebook, and TikTok to promote and sell their supplements to health conscious members of the public. (Doc. 1 at 6). It is reasonable to infer from the overlap in these online retail services and social media platforms that "many of the same consumers would be exposed to . . . both marks." *Frehling,* 192 F.3d at 1340. These two factors thus further militate in Cured Nutrition's favor. *See id*. at 1339–40 (observing that the fourth and fifth *Frehling* factors tilt towards the mark holder because there was at least "some degree of overlap" between the "parties' outlets and customer bases" and because the parties employed "very similar" advertising media).

Relative to the sixth factor (i.e., the defendants' intent), Cured Nutrition alleges that Mithwani's and AvantLights's "unauthorized use of the [CURED m]ark is willful and intentional and likely intended as an effort to trade off of [Cured Nutrition's] goodwill and reputation." (Doc. 1 at 7). Moreover, as Cured Nutrition additionally avers, Mithwani and AvantLights continued utilizing their offending mark even after receiving a notice of possible infringement. *Id*. at 8. As a result, this factor militates in Cured Nutrition's favor too. *See Frehling*, 192 F.3d at 1340 (finding that even where "there was no conscious intent to capitalize on [the plaintiff's] business reputation," an intentional unwillingness to heed a notice of possible infringement was probative of "improper intent"); *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1289 (S.D. Fla. 2010) (inferring a willful violation of the Lanham Act where a

defendant persisted in distributing its infringing products despite receiving a cease-and-desist letter from the plaintiff).

The same be said of the seventh factor (i.e., actual confusion). Cured Nutrition presents sufficient evidence from consumers, potential customers, and social media marketers showing that targeted members of the public are clearly confused about which entity—Cured Nutrition or the Defendants—is marketing which supplements. *See, e.g.,* (Doc. 1 at 36–63); *see Frehling*, 192 F.3d at 1341 (concluding that the confusion of a single customer or supplier can be enough to "raise an inference of actual confusion").

In sum, given that all seven *Frehling* factors favor Cured Nutrition, I find that Cured Nutrition adequately demonstrates that Mithwani and AvantLights engaged in the unauthorized use of the CURED mark "such that consumers were [and are] likely to confuse the two." *Custom Mfg. & Eng'g, Inc.*, 508 F.3d at 648. As such, Cured Nutrition prevails on its section 1125(a) Lanham Act count.

B.

Proceeding to Cured Nutrition's cybersquatting claim under the ACPA, "[c]ybersquatting is essentially extortion" and can take multiple forms. *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 775 (11th Cir. 2015). One type of cybersquatting happens "when the cybersquatter 'intend[s] to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the

trademark owner's.'" *Id.* (quoting *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1247 (11th Cir. 2009)); *see also DaimlerChrysler v. The Net Inc.,* 388 F.3d 201, 204 (6th Cir. 2004) ("'Cybersquatting' occurs when a person other than the trademark holder registers the domain name of a well-known trademark and then attempts to profit from this [maneuver] by . . . using the domain name to divert business from the trademark holder to the domain name holder."). To succeed on an ACPA claim for this sort of cybersquatting, a plaintiff must show that (1) the defendant "registered the domain name" at issue; (2) "the domain name was identical or confusingly similar to [the plaintiff's] trademark that was distinctive at the time of the registration;" and (3) "the domain name was registered in bad faith." *Jysk Bed'N Linen,* 810 F.3d at 778 (citing 15 U.S.C. § 1125(d)).

The first two elements can be readily disposed of here. As noted above, the averments and accompanying documents in Cured Nutrition's complaint demonstrate that Mithwani and AvantLights registered, used, and are using the domain name, "trycured.com," which is "confusingly similar" to Cured Nutrition's preexisting and distinctive CURED mark, as they both contain the same word (i.e., "cured") and both relate to gummies and other dietary and nutritional supplements. *See* (Doc. 1 at 7, 12, 36, 38); *see also Surtain*, 789 F.3d at 1245. The fact that the Defendants' domain name also includes the word "try" and ".com" does not dictate a contrary conclusion. *See Sound Surgical Techs., LLC v. Leonard A. Rubinstein, M.D., P.A.*, 734 F. Supp. 2d 1262, 1275 (M.D. Fla. 2010) ("[S]light differences between domain names and registered

marks, such as the addition of minor or generic words to the disputed domain names are irrelevant. . . . Further, [w]hen evaluating whether a domain name is confusingly similar to a trademark, a . . . court disregards the top-level domain name ([e.g.], '.com,' '.org,' '.net[,]' etc.") (internal quotation marks and citations omitted).

With respect to the third element regarding bad faith, the ACPA sets forth nine factors to aid courts in determining whether a defendant has registered an infringing domain name with deceitful intent. *See* 15 U.S.C. § 1125(d)(B)(i). These factors are:

> (I) [T]he trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard

> to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous[.]

15 U.S.C. § 1125(d)(1)(B)(i).[9]

While these statutory factors are helpful in assessing whether a defendant registered a domain name in bad faith, they are neither exclusive nor necessary for a court to take into account. *See id.*; *see also S. Grouts*, 575 F.3d at 1244 (observing that the ACPA makes "clear[ ]" that the factors it lists are "permissive," not mandatory). Indeed, the Eleventh Circuit has emphasized that "the most important grounds for finding bad faith [under the ACPA] are the unique circumstances of [a] case, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute." *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1223 (11th Cir. 2012) (citing *Sporty's Farm, L.L.C. v. Sportsman's Mkt., Inc.,* 202 F.3d 489, 499 (2d Cir. 2000)) (internal quotation marks omitted).

With this guidance in mind, I start my analysis with the above statutory factors. As to factors I, V, and IX, the allegations in Cured Nutrition's complaint establish that Mithwani and AvantLights do not hold intellectual property rights in their domain name, that their infringement of the CURED mark is willful and intended to profit off of Cured Nutrition's commercial reputation, and that the CURED mark is distinctive.

---

[9] The ACPA also has a safe-harbor provision which states that bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). This provision does not appear to have any pertinence here.

*See* (Doc. 1 at 4, 6–7); *see also Boigris v. EWP P&T, LLC*, 7 F.4th 1079, 1084 (11th Cir. 2021) (stating that by enacting the ACPA, Congress sought to "combat . . . the bad-faith and abusive registration of distinctive marks as [i]nternet domain names with the intent to profit from the goodwill associated with such marks") (internal quotation marks and citations omitted). Relative to factor II, the Defendants' domain name does not include Mithwani's legal name or another moniker for Mithwani. *See Trivest Partners Corp. v. Trivest Fin. LLC*, 2025 WL 2269871, at *7 (S.D. Fla. Mar. 12, 2025) (finding support for a bad faith determination where the defendant's domain consisted of a corporate name rather than the defendant's name); *Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1124 (D. Minn. 2000) (construing the fact that the infringing domain did not contain the "defendant's legal name" or "otherwise identify [the] defendant" as favoring a bad faith finding). Concerning factors III and IV, there is no allegation in Cured Nutrition's complaint that Mithwani and AvantLights employed their domain name before in or around 2024 in connection with the bona fide offering of any goods or services, or that they engaged in the bona fide noncommercial or fair use of the CURED mark in a site accessible under their domain name. *See Citigroup, Inc. v. Chen Bao Shui*, 611 F. Supp. 2d 507, 511 (E.D. Va. 2009) (ruling that factor III bolstered a bad faith finding because the defendant did not utilize the disputed domain name in connection with the bona fide offering of any goods or services prior to registering the domain name); *cf. Gioconda L. Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 437 (S.D.N.Y. 2013) (deeming noncommercial fair use to involve situations where,

unlike in this case, a defendant does not derive any "economic" benefits from its actions). In fact, as explained previously, Cured Nutrition avers that it was only after it "acquired protectable rights in its CURED [m]ark" that "the Defendants adopted and began using a mark confusingly similar to" Cured Nutrition's mark. (Doc. 1 at 5).[10]

With respect to other aspects of the case that "do not fit neatly into the specific [statutory] factors," *Pensacola Motor Sales Inc.*, 684 F.3d at 1223, I find the circumstances surrounding Cured Nutrition's December 2024 cease-and-desist letter to Mithwani and AvantLights to be of import. As recounted earlier, Cured Nutrition stated in its cease-and-desist letter, among other things, that it believed Mithwani and AvantLights were intentionally infringing its CURED mark for commercial benefit and warned them to stop doing so. (Doc. 1 at 8, 24–27). As also described previously, Mithwani and AvantLights not only did not respond to Cured Nutrition's letter, they persisted with their illicit behavior. *Id*. at 8. Multiple courts in this Circuit have viewed such uncompromising conduct as indicative of bad faith under the ACPA. *See PRN Health Servs. LLC v. Nurses PRN of Fla., LLC*, 2022 WL 4072064, at *5 (M.D. Fla. Aug. 16, 2022) ("[E]ven if [the defendants] did not possess the requisite bad faith intent when they began using the infringing domain names, once [the p]laintiff put them on notice, [the d]efendants' continued use of the domain names knowing that they [we]re confusingly similar to [the plaintiff's marks] indicate[d] bad faith."), *report and*

[10] The remaining factors—factors VI through VIII—do not seem to have any application here.

*recommendation adopted*, 2022 WL 4017099 (M.D. Fla. Sept. 2, 2022); *Hunter Residential Servs., LLC v. AAA Randpro Plumbing, Inc.*, 2017 WL 1987247, at *5 (M.D. Fla. Feb. 21, 2017) ("[E]ven if [the defendant] did not possess the requisite intent of bad faith when initially promulgating the domain name, once it was put on notice, the continued use of the domain name with knowledge that it was confusingly similar to [the plaintiff's] mark indicate[d] bad faith."); *see also Alston v. www.calculator.com*, 476 F. Supp. 3d 1295, 1320–21 (S.D. Fla. 2020) ("[U]pon [the defendant's] notification by [the p]laintiff that it was trafficking in [the p]laintiff's . . . [d]omain [n]ame and mark, its alleged continued operation and use of the website constitute[d] bad faith.") (collecting cases). In light of this case authority and for the reasons discussed above, I find that Cured Nutrition prevails on its ACPA claim.

C.

This brings me to Cured Nutrition's FDUTPA count. To prove this claim, Cured Nutrition must show "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. Dist. Ct. App. 2008) (citations omitted); *Gen. Motors Acceptance Corp. v. Laesser,* 718 So. 2d 276, 277 (Fla. Dist. Ct. App. 1998). Cured Nutrition meets each of these elements.

Regarding the deceptive act or unfair practice requirement, I have already concluded that Cured Nutrition succeeds on its Lanham Act claim. As a number of federal courts in Florida have recognized, this determination satisfies the FDUTPA's first element. *See Maurer Rides USA, Inc. v. Beijing Shibaolia Amusement Equip. Co. Ltd.*,

2012 WL 2469981, at *4 (M.D. Fla. 2012) ("Because [the plaintiff] has adequately pleaded facts establishing liability under the Lanham Act, it has also established liability for . . . FDUTPA."); *Rain Bird Corp. v. Taylor*, 665 F. Supp. 2d 1258, 1267 (N.D. Fla. 2009) ("The legal standards for Florida statutory and common law claims of trademark infringement and unfair competition under the . . . FDUTPA . . . are the same as those for federal claims of trademark infringement and unfair competition."); *TracFone Wireless, Inc. v. GSM Group, Inc.*, 555 F. Supp. 2d 1331, 1338 (S.D. Fla. 2008) ("Engaging in trademark infringement is an unfair and deceptive trade practice that constitutes a violation of the [FDUTPA].") (citation omitted).

As for the remaining two elements, Cured Nutrition avers that Mithwani's and AvantLights's infringing activities have caused Cured Nutrition to incur actual damages, including expenses due to "consumer complaints" stemming from confusion over the origin of the products bearing its CURED mark. *See* (Doc. 29 at 23); (Doc. 1 at 8–9); *see also Buckley v. Moore*, 2021 WL 3173185, at *10 (S.D. Fla. July 26, 2021) (stating that "expend[ing] money on reputation management services as a result of [the defendant's] conduct" is a basis for actual damages). Accordingly, Cured Nutrition succeeds on its FDUTPA claim.

V.

The last component of Cured Nutrition's motion concerns the remedies it seeks. These remedies are (a) a permanent injunction under the Lanham Act and the ACPA, (b) statutory damages under the Lanham Act and the ACPA, and (c) attorneys' fees

under the Lanham Act. (Doc. 29 at 25–38).[11] I will address each of these forms of relief in turn.

A.

A court may issue a permanent injunction pursuant to the Lanham Act "according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). This is true even when the injunctive relief is sought as part of a motion for a default judgment. *See Ain Jeem, Inc. v. Individuals, P'ships & Unincorporated Ass'ns Identified on Schedule "A,"* 2022 WL 2306858, at *4 (M.D. Fla. Jan. 27, 2022), *report and recommendation adopted sub nom., Ain Jeem, Inc. v. Individuals*, 2022 WL 2306874 (M.D. Fla. Feb. 15, 2022); *PetMed Express,* 336 F. Supp. 2d at 1222–23.

The fact that the Lanham Act authorizes injunctive relief, however, does not end the inquiry. Cured Nutrition must still show that this remedy is warranted under the circumstances presented. To make such a showing, Cured Nutrition must demonstrate that (1) it has succeeded on the merits; (2) it has suffered an irreparable injury; (3) there is no adequate remedy at law; (4) the balance of hardship favors an equitable remedy; and (5) the issuance of an injunction would not harm the public's interest. *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391–93 (2006); *Angel*

[11] Cured Nutrition does not ask for an injunction under the FDUTPA, nor does it request actual (i.e., non-statutory) damages. (Doc. 29 at 34). As a result, it has waived its right to these remedies. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it.") (citation omitted), *overruled in part on other grounds by United States v. Durham*, 795 F.3d 1329, 1331 (11th Cir. 2015) (en banc).

*Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008). Cured Nutrition carries its burden on all five of these elements.

With respect to the first requirement, where—as in this case—a defendant is in default, "the element of success on the merits is satisfied." *Virgin Recs. Am., Inc. v. Courson*, 2007 WL 3012372, at *2 (M.D. Fla. Oct. 12, 2007) (citing *Sony Music Entm't v. Global Arts Prods.*, 45 F. Supp. 2d 1345, 1347 (S.D. Fla. 1999)). As for the second requirement, the Lanham Act creates a rebuttable presumption of irreparable harm when a plaintiff prevails on an unfair competition claim under the Act, as Cured Nutrition has done here. *See* 15 U.S.C. § 1116(a). Mithwani and AvantLights do not rebut this presumption, nor can they. This is because—as detailed in Cured Nutrition's well-pleaded compliant—they have caused and continue to cause permanent damage to Cured Nutrition's "reputation and goodwill" by depriving Cured Nutrition of its ability to "control the quality of what appears to be its products in the marketplace." *Chanel, Inc. v. besumart.com*, 240 F. Supp. 3d 1283, 1290 (S.D. Fla. 2016); *see also Crossfit, Inc. v. Quinnie*, 232 F. Supp. 3d 1295, 1316 (N.D. Ga. 2017) (stating that "[t]he lack of control over one's mark creates the potential for damage to [the mark holder's] . . . reputation[, which] constitutes [an] irreparable injury for the purpose of granting a[n] . . . injunction in a trademark case") (citing *Ferrellgas Partners, L.P. v. Barrow*, 143 F. Appx. 180, 190 (11th Cir. 2005)) (internal quotation marks omitted); *PODS Enters., LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1287 (M.D. Fla. 2015) (noting that an irreparable injury occurs if an infringing mark "cause[s] a likelihood of confusion").

Regarding the third requirement, "[i]t is . . . generally recognized in trademark infringement cases that there is no adequate remedy at law to redress infringement." *Crossfit*, 232 F. Supp. 3d at 1316–17 (citing *Tally–Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1029 (11th Cir. 1989)) (internal quotations omitted); *see also Processed Plastic Co. v. Warner Commc'ns,* 675 F.2d 852, 858 (7th Cir. 1982) (["T]he damages occasioned by trademark infringement are by their very nature . . . not susceptible of adequate measurement for remedy at law.") (collecting cases). The fourth requirement is likewise straightforward because Mithwani and AvantLights "face no hardship if they are prohibited from . . . infring[ing upon] . . . [Cured Nutrition's] trademarks, . . . [as such conduct constitutes] an illegal act." *Chanel, Inc.*, 240 F. Supp. 3d at 1290–91 (S.D. Fla. 2016); *see also It's A 10, Inc. v. Beauty Elite Grp., Inc.,* 932 F. Supp. 2d 1325, 1333 (S.D. Fla. 2013) (noting that the defendant would not suffer significant hardship if enjoined because the defendant was without right to use the trademark in question in the first place). Indeed, the balance of hardships particularly favors Cured Nutrition to the extent Mithwani and AvantLights are able to rebrand their products upon being foreclosed from employing their infringing mark and to the extent Cured Nutrition has to spend significant sums of money—on top of the multiple millions it has already expended—to protect and promote its reputation in the absence of injunctive relief. *See* (Doc. 1 at 4); (Doc. 29 at 27); *see also PODS Enters.,* 126 F. Supp. 3d at 1287 (concluding that where a defendant can voluntarily cease infringing a mark, the

balance of hardships sides with the party seeking an injunction, especially if the non-infringing party devoted millions of dollars to developing the reputation of its mark).

Relative to the fifth requirement, as referenced previously, Cured Nutrition has tendered evidence that Mithwani's and AvantLights's infringing activities have led to confusion in the marketplace. *See, e.g.,* (Doc. 1 at 36–63). Under such a scenario, a permanent injunction advances the public interest because it safeguards "consumers from being misled by [the Defendants'] products." *Chanel, Inc.*, 240 F. Supp. 3d at 1291; *see also Davidoff & CIE, S.A. v. PLD Int'l Corp.,* 263 F.3d 1297, 1304 (11th Cir. 2001) ("[T]he public interest is served by preventing consumer confusion in the marketplace.") (citation omitted); *SunAmerica Corp. v. Sun Life Assur. Co. of Can.*, 77 F.3d 1325, 1334 (11th Cir. 1996) (determining that the public interest in avoiding confusion in the marketplace is "paramount to any inequity caused the junior user" by the issuance of an injunction) (alterations omitted).

In sum, Cured Nutrition meets the strictures for obtaining a permanent injunction against Mithwani and AvantLights. All that is left to decide is what are the contours of that injunction. In resolving this issue, I am guided by two related principles. The first is that, under Rule 54, the nature and scope of an injunction may not surpass that sought by a plaintiff in its complaint or other pleadings. *See* Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."). The second is that while a plaintiff moving for a default judgment cannot enlarge the breadth of the injunction outlined in its

complaint, it may narrow it. *See Diamond Resorts U.S. Collection Dev., LLC v. Saliba*, 2022 WL 19479012, at *7 (M.D. Fla. Dec. 23, 2022) (limiting the parameters of the injunction described in the plaintiff's complaint in granting the plaintiff's motion for a default judgment).

Here, Cured Nutrition avails itself of the latter tenet by restricting the requested injunctive relief to a subset of the terms set forth in its complaint. *Compare* (Doc. 1 at 13–16) *with* (Doc. 29 at 27–29). In particular, Cured Nutrition asks only that the Defendants be enjoined from:

> 1. Manufacturing, distributing/providing, selling, marketing, advertising, promoting, or authorizing any third party to manufacture, distribute/provide, sell, market, advertise, or promote dietary supplements, nutritional supplements, and gummies bearing the mark CURED or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the CURED mark;
>
> 2. Engaging in any activity that infringes Cured Nutrition's rights in its CURED mark;
>
> 3. Engaging in any activity constituting unfair competition with Cured Nutrition;
>
> 4. Engaging in any activity that is likely to dilute the distinctiveness of Cured Nutrition's CURED mark;
>
> 5. Making or displaying any statement, representation, or depiction that is likely to lead the public or the trade to believe that (i) the Defendants' dietary supplements, nutritional supplements, and gummies are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with Cured Nutrition, or (ii) Cured Nutrition's dietary supplements, nutritional supplements, and gummies are in any manner approved,

> endorsed, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with the Defendants;
>
> 6. Using or authorizing any third party to use (in connection with any business, goods, or services) any false description, false representation, or false designation of origin, or any marks, names, words, symbols, devices, or trade dress that falsely associate such business, goods and/or services with Cured Nutrition or tend to do so;
>
> 7. Registering or applying to register any trademark, service mark, domain name, trade name, or other source identifier or symbol of origin consisting of or incorporating the CURED mark or any other mark that infringes or is likely to be confused with Cured Nutrition's CURED mark, or any goods or services of Cured Nutrition, or Cured Nutrition as their source;
>
> 8. Aiding, assisting, or abetting any other individual or entity in doing any act prohibited by paragraphs (1) through (7) above; and
>
> 9. Registering and/or purchasing any other domain name that contains terms that are confusingly similar to the CURED mark, or any formative variations thereof.

(Doc. 29 at 27–29).

At oral argument, I pressed Cured Nutrition on the propriety of the second and third paragraphs on the grounds that they were too vague and simply demanded that Mithwani and AvantLights follow the law. *See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1203 (11th Cir. 2001) (stating that an injunction "should clearly let [the] defendant[s] know what [they are] ordered to do or not to do," should "be phrased in terms of objective actions, not legal conclusions," and should not "merely forbid[ the] defendant[s] from performing acts of 'unfair competition,' or from 'infringing on [the] plaintiff's trademarks and trade secrets[,]'" as such language "adds

nothing to what the law already requires") (internal quotation marks and citation omitted)); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (criticizing "broad and vague" injunctions that "do[ ] no more than instruct [a defendant] to obey the law") (internal quotation marks and citation omitted). Cured Nutrition agreed at oral argument that these provisions were unnecessary and should be struck.

I also queried Cured Nutrition at oral argument about the merits of the fourth paragraph, as Cured Nutrition did not produce any meaningful evidence that Mithwani and AvantLights applied for other trademarks outside of their infringing mark. *See PODS Enters.*, 126 F. Supp. 3d at 1288 (declining to "enjoin [a defendant] from attempting to apply for trademarks which may be confusingly similar or dilutive of the [plaintiff's] marks" because the plaintiff did not "introduce significant evidence" indicating that the defendant had "applied for [such] trademarks"). Cured Nutrition conceded that this prohibition should be struck as well.

With respect to the remainder of Cured Nutrition's proposed injunction, I find that it falls within the confines of the Lanham Act and associated case law. *See Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1242 (11th Cir. 2008) ("Federal courts may grant permanent injunctions where infringement is found to have occurred in order to prevent further infringing use of a mark, and such injunctions should be designed to keep the former infringers 'a safe distance away' from the protected mark.") (quoting *Howard Johnson Co. v. Khimani,* 892 F.2d 1512, 1517 (11th Cir. 1990)).

Turning to the injunctive relief sought by Cured Nutrition under the ACPA, Cured Nutrition asks that Mithwani's and AvantLights's infringing domain name—i.e., trycured.com—be transferred to it. (Doc. 29 at 36). This request is also well founded. For one, such relief is authorized by the ACPA. *See* 15 U.S.C. § 1125(d)(l)(C) ("In any civil action involving the registration, trafficking, or use of a domain name under [the ACPA], a court may order the . . . transfer of the domain name to the [aggrieved party]."). For another, courts in this Circuit have approved such domain transfers where, as here, the defendants have engaged in cybersquatting with a bad-faith intent to profit, and where such transfers would safeguard the plaintiff's commercial reputation. *See, e.g., Jysk*, 810 F.3d at 780 (affirming the transfer of the offending domain names to the plaintiff, in part, because failing to do so would deny the plaintiff "full control over websites that bear its trademark" and could cause it to lose goodwill); *Bioclin BV v. Multygyn USA, LLC*, 72 F. Supp. 3d 1288 1297–98 (M.D. Fla. 2014) (directing the defendants as part of an injunction on an ACPA claim to assign and/or transfer to the plaintiff the rights to their website, which was "confusingly similar" to the plaintiff's website and which had "already caused confusion among the public"); *Victoria's Cyber Secret Ltd. P'ship v. V Secret Catalogue, Inc.*, 161 F. Supp. 2d 1339, 1356 (S.D. Fla. 2001) (ordering the transfer of four domain names under the ACPA). Accordingly, I respectfully submit that the infringing domain, trycured.com, should be transferred to Cured Nutrition.

B.

In addition to injunctive relief, Cured Nutrition asks for an award of monetary damages for both its Lanham Act and ACPA claims. (Doc. 29 at 31, 32). This request has merit as well.

The Lanham Act provides, in pertinent part, that in lieu of actual damages and profits, a claimant may elect to receive "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed[.]" 15 U.S.C. § 1117(c)(1). "[I]f the court finds that the use of the counterfeit mark was willful, [a plaintiff is entitled to] no[ ] more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed[.]" 15 U.S.C. § 1117(c)(2); *see also Daimler Truck AG v. P'ships & Unincorporated Ass'ns Identified on Schedule A*, 794 F. Supp. 3d 1300, 1306 (S.D. Fla. 2025) (same) (quoting 15 U.S.C. § 1117(c)(2)). These statutory damages "serve the dual purposes of compensating the plaintiff and sanctioning and deterring infringers." *Ingram Enters., Inc. v. Showtime Fireworks Orlando LLC*, 2024 WL 2874640, at *8 (M.D. Fla. May 1, 2024) (citation omitted), *report and recommendation adopted sub nom.*, *Ingram Enters., Inc. v. Showtime Fireworks Orlando LLC Showtime Fireworks & Souvenirs LLC*, 2024 WL 3342218 (M.D. Fla. June 10, 2024). Consistent with these objectives, an award of statutory damages under the Lanham Act is allowed even if a plaintiff is unable to prove that the defendant's infringement adversely impacted the plaintiff monetarily. *See Under Armour, Inc. v. 51nfljersey.com*, 2014 WL 1652044, at *7 (S.D. Fla. Apr. 23,

2014) (collecting cases). A court ultimately has wide latitude in selecting an appropriate amount of Lanham Act damages. *Gucci Am., Inc. v. Individuals, Bus. Entities, & Unincorporated Ass'ns Identified on Schedule "A,"* 2025 WL 2256527, at *4 (S.D. Fla. May 27, 2025) (citing *Cable/Home Comm. Corp.*, 902 F.2d at 852).

In this case, I have already concluded that Mithwani's and AvantLights's infringing behavior was motivated by ill intent relative to the CURED mark. As a result, Cured Nutrition is eligible for up to $2,000,000 in statutory damages under the Lanham Act. *See Daimler Truck AG v. P'ships & Unincorporated Ass'ns Identified on Schedule A*, 794 F. Supp. 3d 1300, 1306 (S.D. Fla. 2025) ("When [a court] determine[s] that the infringement [prohibited by the Lanham Act] is willful, [it] may impose statutory damages up to '$2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as [it] consider[s] just.'") (quoting 15 U.S.C. § 1117(c)(2)). To ascertain what is the proper sum within this broad range, courts examine a multitude of factors, including:

> (1) whether the defendant's conduct was innocent or willful; (2) whether a defendant cooperated in providing particular records from which to assess the value of the infringing material produced; (3) the expenses saved and profits reaped; (4) the revenue lost by the plaintiff; (5) the value of the trademark; (6) the deterrent effect of others besides the defendant; (7) the potential for discouraging the defendant; and (8) whether the counterfeit goods posed a risk to public safety.

*Shenzhen Dejiayun Network Tech. Co. v. Li*, 2025 WL 1436320, at *11 (S.D. Fla. May 20, 2025), *report and recommendation adopted*, 2025 WL 2427712 (S.D. Fla. July 17, 2025) (citing *Top Tobacco, L.P. v. Star Imps. & Wholesalers, Inc.*, 135 F.4th 1344, 1348–49 (11th

Cir. 2025)); *see also Nike, Inc. v. Austin,* 2009 WL 3535500, at *4 (M.D. Fla. Oct. 28, 2009) (citing many of the above factors as instructive in arriving at a Lanham Act statutory damages figure); *Illinois Tool Works Inc. v. Hybrid Conversions, Inc.*, 817 F. Supp. 2d 1351, 1355 (N.D. Ga. 2011) (same) (citations omitted).

Against this backdrop, Cured Nutrition asks that it be granted at least $200,000 in Lanham Act damages and as much as the $2,000,000 statutory maximum. (Doc. 29 at 34). Although I agree that Cured Nutrition is entitled to meaningful monetary relief, this range is too high. To begin, an analysis of many of the above factors does not support a damage figure of such magnitude. (Doc. 29 at 33–34). By way of example, regarding the fifth factor—i.e., the value of the trademark—Cured Nutrition merely states that "the record reflects . . . [it] has spent time and money building the goodwill of its brand." (Doc. 29 at 33); *see also Microsoft Corp. v. Gordon*, 2007 WL 1545216, at *2 (N.D. Ga. May 24, 2007) (observing that larger statutory damage awards "should be reserved for cases of notable scope or particularly egregious conduct").

Moreover, a survey of Lanham Act cases in this District reveals that statutory damages awards where there has been willful infringement typically do not exceed $100,000 where, as here, a plaintiff fails to offer sufficient, specific evidence quantifying its losses and the defendant's profits. *See The Trump Org. LLC and DTTM Operations LLC, v. The Individuals . . . Identified on Schedule A*, 2026 WL 678552, at *6–7 (M.D. Fla. Feb. 5, 2026) (citing Lanham Act cases where courts granted $100,000 in

statutory damages to plaintiffs with a single mark, who showed that there was willful conduct but did not present enough evidence demonstrating the defendants' profits and the plaintiffs' losses), *report and recommendation adopted sub nom.*, *Trump Org. LLC and DTTM Operations LLC v. The Individuals . . . Identified on Schedule A*, 2026 WL 674519 (M.D. Fla. Mar. 10, 2026); *cf. Ingram Enters., Inc.,* 2024 WL 2874640, at *8 (finding "an award of $20,000 per mark, totaling $40,000, to be reasonable and appropriate to compensate the [p]laintiff and to sanction the [d]efendants for [their willful] infringement," noting that this figure was "in[ ]line with . . . the amount awarded in cases in which the trademark owners provided some evidence in support of their requests for statutory damages") (collecting cases). After all, although deterrence is important, "[s]tatutory damages are not intended to provide a plaintiff with a windfall recovery; they should bear some relationship to the actual damages suffered." *Ghost Controls, LLC v. Gate1access LLC & Julio Toledo*, 2020 WL 8309717, at *6 (M.D. Fla. Oct. 16, 2020*), report and recommendation adopted sub nom.*, *Ghost Controls, LLC v. Gate1access LLC*, 2021 WL 50334 (M.D. Fla. Jan. 6, 2021) (citing *Clever Covers, Inc. v. Sw. Fla. Storm Def., LLC*, 554 F. Supp. 2d 1303, 1312 (M.D. Fla. 2008)) (internal quotation marks omitted). Given this line of decisions, I find that $100,000 in Lanham Act statutory damages is adequate to fulfill the dual goals of "compensation and deterrence." *The Trump Org., LLC*, 2026 WL 678552, at *6–7. At oral argument, I discussed this issue with Cured Nutrition's counsel, and she advised that Cured Nutrition did not object to the $100,000 figure.

Along with the Lanham Act damages, Cured Nutrition also seeks monetary relief under the ACPA. Similar to the Lanham Act, the ACPA authorizes a plaintiff to recover statutory damages ranging from $1,000–$100,000 per domain name in lieu of actual damages. *See* 15 U.S.C. § 1117(d). The purpose behind such damages—as with the Lanham Act—is to compensate plaintiffs and to deter wrongful conduct. *See Korean Air Lines Co. v. Skypass, LLC*, 2014 WL 12862754, at *7 (S.D. Fla. Oct. 22, 2014) (citation omitted), *report and recommendation adopted,* 2014 WL 12862759 (S.D. Fla. Dec. 2, 2014). Akin to the Lanham Act as well, courts generally "have wide discretion in determining the amount of statutory damages" to be granted under the ACPA. *Id.* (citing *B & F Sys., Inc. v. LeBlanc*, 2012 WL 2529191, at *7 (M.D. Ga. June 29, 2012), *aff'd*, 519 F. App'x 537 (11th Cir. 2013) and *Columbia Pics. Television, Inc. v. Krypton Broad. of Birm., Inc.*, 259 F.3d 1186, 1194 (9th Cir. 2001)).

Here, Cured Nutrition seeks $100,000 in ACPA damages, arguing that this sum is justified given that Mithwani and AvantLights continue to "engage in cybersquatting and other acts of infringement[ ] despite being aware of this lawsuit." (Doc. 29 at 31). In support of this contention, Cured Nutrition points out that "[c]ourts in the Eleventh Circuit have awarded somewhere between $50,000 to $100,000 per domain when there is evidence the infringer has acted in bad faith." *See E-Z-Dock, Inc. v. KonaDocks LLC*, 2022 WL 8221613, at *9 (M.D. Fla. Aug. 5, 2022), *report and recommendation adopted,* 2022 WL 3974333 (M.D. Fla. Sept. 1, 2022) (internal quotation marks and citations omitted). I agree with Cured Nutrition that $100,000

in statutory damages under the ACPA are warranted based on the above decisional law and my prior determinations, including my finding that Mithwani's and AvantLights's infringing activities were undertaken with ill intent. *See Generator Guru Ltd. v. Generator Guru LLC*, 2026 WL 529710, at *7 (M.D. Fla. Feb. 5, 2026) (ruling in the context of a default judgment motion that an award of $100,000 in statutory damages for a single domain name was "reasonable") (collecting cases), *report and recommendation adopted*, 2026 WL 525095 (M.D. Fla. Feb. 25, 2026); *Korean Air Lines*, 2014 WL 12862754, at *7 (granting $100,000 in statutory damages for a single domain name in connection with a default judgment motion to deter future illicit actions taken in bad faith) (collecting cases).

C.

As referenced previously, the final matter to be addressed is Cured Nutrition's entitlement to attorneys' fees under the Lanham Act. (Doc. 29 at 2, 34–36).[12] The

[12] Cured Nutrition additionally asks in its motion that the Court award it fees under the FDUTPA. (Doc. 29 at 2). I do not attempt to resolve this request here for two reasons. As an initial matter, Cured Nutrition does not appear to seek fees pursuant to the FDUTPA in its complaint. *See* Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."); *see also United States v. Mastrapa*, 2013 WL 5230671, at *2 (M.D. Fla. Sept. 16, 2013) (concluding that a plaintiff was not entitled to attorney's fees on a specific claim because the complaint pressing that claim "d[id] not include any allegations regarding a[n] . . . entitlement to . . . fee[s]"); *cf. WM Cap. Partners, LLC v. Big Dawg Servs., Inc.*, 2013 WL 5529604, at *2 (S.D. Ala. Oct. 7, 2013) (finding that a motion for default judgement on a particular claim did not violate Rule 54(c) when seeking attorney's fees because the complaint also requested such fees). Furthermore, Cured Nutrition's FDUTPA fee request is made in wholly perfunctory fashion, and Cured Nutrition does not explain elsewhere in its motion why it should be granted fees pursuant to that statute.

I also do not address whether Cured Nutrition should be granted fees pursuant to the ACPA. While Cured Nutrition asks for fees under the ACPA in its complaint, it does not reference the ACPA in connection with its fee request at all in its motion. *See, e.g.*, (Doc. 29 at 2).

Lanham Act empowers "[a] court in exceptional cases . . . [to] award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Historically, the Eleventh Circuit has viewed a case as "exceptional" where the infringing party acted intentionally and/or in bad faith against the aggrieved party. *See Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332, 1335 (11th Cir. 2001) (defining an exceptional case as "one that can be characterized as malicious, fraudulent, deliberate and willful, . . . or one in which evidence of fraud or bad faith exists") (internal quotation marks and citations omitted); *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.,* 106 F.3d 355, 363 (11th Cir. 1997) ("[E]xceptional cases are those where the infringing party acts in a malicious, fraudulent, deliberate, or willful' manner.") (internal quotation marks and citation omitted).

In its decision in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), however, the United States Supreme Court ruled that the eligibility criteria for attorneys' fees under the Lanham Act is broader, stating that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* at 554. The Supreme Court also explained in *Octane Fitness* that "[t]here is no precise rule or formula" for

In light of these procedural infirmities, I believe the better course is to defer a decision on these other fee bases until Cured Nutrition raises the matter in a properly supported fee entitlement motion brought after judgment is entered in this action. *See* Fed. R. Civ. P. 54(d)(2); M.D. Fla. R. 7.01(a), (b).

assessing when attorneys' fees are warranted under the Lanham Act, and that the resolution of the issue is ultimately left to the discretion of the trial court. *See id*. (internal quotation marks and citation omitted).

Since *Octane Fitness* was handed down, the Eleventh Circuit has instructed courts to analyze Lanham Act fee petitions "on a case-by-case basis" and to take into account "'frivolousness, motivation, [and] objective unreasonableness' as relevant considerations in determining whether a case is 'exceptional.'" *Am. S. Homes Holdings, LLC v. Erickson*, 2025 WL 1067073, at *5 (11th Cir. Apr. 9, 2025) (quoting *Octane Fitness* at 554 & n.6). Under this post-*Octane* framework, fee awards may be justified if the arguments or positions taken by the losing party are "baseless" or just "unusually weak." *Domond v. PeopleNetwork APS*, 750 F. App'x 844, 848 (11th Cir. 2018).

Applying the teachings of *Octane Fitness* and its progeny here, I find that this case is exceptional given that Mithwani and AvantLights acted willfully and in bad faith by continuing to infringe the CURED mark even after Cured Nutrition notified them of the illegality of their behavior. As a result, Cured Nutrition is entitled to attorneys' fees under the Lanham Act. *See CarMax Auto Superstores, Inc. v. StarMax Fin., Inc.*, 192 F. Supp. 3d 1279, 1283–84 (M.D. Fla. 2016) (approving attorney's fees as part of a default judgment in a Lanham Act case where the defendant had "actual knowledge of the impropriety of its conduct, as evidenced by [the plaintiff's] pre-suit notification efforts"); *Crossfit,* 232 F. Supp. 3d at 1314 (awarding attorney's fees in a Lanham Act suit where the defendants' actions were "willful" and where they "failed

to cooperate" after the plaintiff put them on notice of their infringing activities); *PetMed Express*, 336 F. Supp. 2d at 1222 (granting attorney's fees in Lanham Act action where the defendant willfully infringed and did not refrain from doing so despite receiving notice from the plaintiff).

VI.

Based upon the foregoing, I respectfully recommend that the Court:

1. Grant in part and deny in part Cured Nutrition's amended motion for a default judgment (Doc. 29) as more fully described herein.

2. Enter a permanent injunction enjoining Defendants Mithwani and AvantLights from:

a. manufacturing, distributing/providing, selling, marketing, advertising, promoting, or authorizing any third party to manufacture, distribute/provide, sell, market, advertise, or promote dietary supplements, nutritional supplements, and gummies bearing the mark CURED or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of Cured Nutrition's CURED mark;

b. making or displaying any statement, representation, or depiction that is likely to lead the public or the trade to believe that (i) the Defendants' dietary supplements, nutritional supplements, and gummies are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with Cured Nutrition; or (ii) Cured Nutrition's dietary

supplements, nutritional supplements, and gummies are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with the Defendants;

c. using or authorizing any third party to use (in connection with any business, goods, or services) any false description, false representation, or false designation of origin, or any marks, names, words, symbols, devices, or trade dress that falsely associate such business, goods and/or services with Cured Nutrition or tend to do so;

d. registering or applying to register any trademark, service mark, domain name, trade name, or other source identifier or symbol of origin consisting of or incorporating the mark CURED or any other mark that infringes or is likely to be confused with Cured Nutrition's CURED mark, or any goods or services of Cured Nutrition, or Cured Nutrition as their source;

e. aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-paragraphs (a) through (d);

f. registering and/or purchasing any other domain name that contains terms that are confusingly similar to the CURED mark, or any formative variations thereof.

3. Award Cured Nutrition $100,000 in Lanham Act statutory damages for violating 15 U.S.C. § 1125(a).

4. Award Cured Nutrition $100,000 in ACPA statutory damages for violating 15 U.S.C. § 1125(d).

5. Direct that the domain "trycured.com" be transferred to Cured Nutrition.

6. Determine that Cured Nutrition is entitled to attorneys' fees under the Lanham Act.

7. Direct the Clerk of Court to terminate any pending motions and to close the case.

8. Deny Cured Nutrition's motion for a default judgment in all other respects.

Respectfully submitted this 25th day of July 2026.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

## NOTICE TO PARTIES

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies to:
Honorable Thomas P. Barber, United States District Judge
Counsel of record